## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| Stephanie Surratt, individually and on behalf of all others similarly situated, | 1:22-cv-00650 |
| Plaintiff, | |
| - against - | Class Action Complaint |
| CVS Pharmacy, Inc., | |
| Defendant | Jury Trial Demanded |

Plaintiff alleges upon information and belief, except for allegations pertaining to Plaintiff, which are based on personal knowledge:

1.      CVS Pharmacy, Inc. ("Defendant") manufactures, labels, markets, and sells infant formula with iron to children between 9 and 18 months, identified as "Toddler Beginnings," under the CVS Health brand (the "Product").



## I.    BASICS OF INFANT NUTRITION

2.    According to the World Health Organization ("WHO") and private and public health groups, breast milk is the "gold standard" for infant nutrition.

3.    The American Academy of Pediatrics (AAP) recommends "exclusive breastfeeding for the first 6 months of life with the addition of complementary foods and the continuation of breastfeeding until at least 12 months of age."[1]

4.    Infant formula with added iron is the accepted alternative where breastfeeding is not an option. 21 C.F.R. § 106.3 (defining infant formula as "a food which purports to be or is represented for special dietary use for infants [0-12 months] by reason of its simulation of human milk or its suitability as a complete or partial substitute for human milk.").

5.    The transition beyond the first twelve months is "critical for establishing healthy dietary preferences and preventing obesity in children."[2]

## II.    INCREASED BREASTFEEDING RESULTS IN COMPANIES SEEKING NEW WAYS TO SELL INFANT FORMULA

6.    Since 2003, rates of breastfeeding have increased significantly, resulting in a decrease in sales of infant formula.

7.    To make up for declining sales of infant formulas, companies have introduced products marketed as "transition formulas," "follow-on formulas," "weaning formulas," "toddler milks," and "growing-up milks" ("GUMs") (collectively, "Transition Formulas") to children between 12 and 36 months old.[3]

---

[1] *Id.*
[2] Jennifer L. Harris, and Jennifer L. Pomeranz, "Infant formula and toddler milk marketing: opportunities to address harmful practices and improve young children's diets." Nutrition Reviews (2020).
[3] Jennifer L. Pomeranz, Maria J. Romo Palafox, and Jennifer L. Harris. "Toddler drinks, formulas, and milks: Labeling practices and policy implications." Preventive medicine 109 (2018): 11-16 (citing American Academy of Pediatrics (AAP) Committee on Nutrition and World Health Organization (WHO) findings).

8.    U.S. Nielsen data shows advertising spending on transition formula quadrupled between 2003 and 2015, with sales increasing almost threefold.

9.    The formula trade group, the Infant Nutrition Council of America ("INCA"), recommends that "transition formulas," such as Toddler Beginnings, be used to fill "nutrition gaps," beyond 12 months.[4]

10.    However, a global consensus of pediatric health organizations, including the AAP Committee on Nutrition and the relevant Sub-Committees of the WHO, and government bodies, disagree with INCA's conclusion, and advise that beyond 12 months, nutritional needs should be met with whole cow's milk, water and healthy whole foods as part of a balanced diet.[5]

11.    Companies like Defendant capitalize on consumers' familiarity and acceptance of federally-approved infant formula and continue selling them the same or substantially identical products even when their children are no longer infants, defined as zero to twelve months old.

12.    The identical labeling elements ride the coattails of the carefully regulated and trusted infant formula to drive sales.

13.    Defendant's Toddler Beginnings (top) is advertised and marketed in a way that is similar and parallel to its Infant Formula (bottom), through common and parallel labeling formats, images, design, type size, fonts, claims, call-outs and graphics.

---

[4] Olga Khazan, The Ominous Rise of Toddler Milk, Baby-formula sales are slumping, so the companies that make it have turned to supplements for 3-year-olds, December 29, 2020.
[5] AAP Committee on Nutrition, 1988. Follow-on formulas follow-up or weaning formulas. Pediatrics 83, 1067 1989; World Health Organization, July 17, 2013. Information concerning the use and marketing of follow-up formula.





14.     The representations further the incorrect impression that the Toddler Beginnings is what children should be fed in "next stage" beyond infancy.

| Infant Formula | Toddler Beginnings |
|---|---|
| Infant Formula With Iron – Milk-Based Powder | Infant Formula With Iron – Milk-Based Powder |
| 0 – 12 Months | Stage 2: 9-18 Months |

| | |
|---|---|
| Experts recommend DHA & Choline | DHA, Iron & Choline to Help Nourish the Brain |
| Nutrients found in breast milk | Balanced Nutrition |
| Neuro Complete | Neuro Support |
| Supports Brain Development | Supports Brain Development |
| • Cognitive | • Cognitive |
| • Social | • Social |
| • Motor | • Motor |
| • Communication | • Communication |
| Stuffed Duck | Building Blocks With Letters |
| Non-GMO† | Non-GMO† |
| † Ingredients not genetically engineered | † Ingredients not genetically engineered |

15. The Product's name, "Infant Formula With Iron – Milk-Based Powder" (top) is deceptive and misleading because it is confusingly similar and identical to the name of Defendant's infant formula, "Infant Formula – Milk-Based Powder With Iron" (bottom).



16. These identical names mislead caregivers by not telling them how the Product may differ from the Infant Formula.

17. While the Infant Formula product contains a picture of a stuffed duck, the Product contains building blocks containing letters of the alphabet.

5

18. This shows caregivers that the Product should be part of a child's progression and development as they grow.

19. The Product's labeling is misleading because it displays nutrition information via an infant formula panel, even though it is not intended or recommended for infants.

**Toddler Beginnings**

DILUTED: EACH 5 FL OZ (150 mL) CONTAINS 100 CALORIES

| NUTRIENTS: | PER 100 CALORIES: |
|---|---|
| PROTEIN g | 2.6 |
| FAT g | 5.3 |
| CARBOHYDRATE g | 10.5 |
| WATER g | 133 |
| LINOLEIC ACID mg | 800 |
| **VITAMINS:** | |
| VITAMIN A IU | 300 |
| VITAMIN D IU | 60 |
| VITAMIN E IU | 2 |
| VITAMIN K mcg | 9 |
| THIAMINE (VITAMIN $B_1$) mcg | 80 |
| RIBOFLAVIN (VITAMIN $B_2$) mcg | 140 |
| VITAMIN $B_6$ mcg | 60 |
| VITAMIN $B_{12}$ mcg | 0.3 |
| NIACIN mcg | 1000 |
| FOLIC ACID (FOLACIN) mcg | 16 |
| PANTOTHENIC ACID mcg | 500 |

| VITAMINS: | PER 100 CALORIES: |
|---|---|
| BIOTIN mcg | 3 |
| VITAMIN C (ASCORBIC ACID) mg | 12 |
| CHOLINE mg | 24 |
| INOSITOL mg | 6 |
| **MINERALS:** | |
| CALCIUM mg | 195 |
| PHOSPHORUS mg | 130 |
| MAGNESIUM mg | 8 |
| IRON mg | 2 |
| ZINC mg | 1 |
| MANGANESE mcg | 15 |
| COPPER mcg | 75 |
| IODINE mcg | 10 |
| SELENIUM mcg | 2.8 |
| SODIUM mg | 36 |
| POTASSIUM mg | 130 |
| CHLORIDE mg | 80 |

DISTRIBUTED BY CVS PHARMACY, INC

**Infant Formula**

DILUTED: EACH 5 FL OZ (150 mL) CONTAINS 100 CALORIES

| NUTRIENTS: | PER 100 CALORIES: | VITAMINS: (cont.) | | MINERALS: | |
|---|---|---|---|---|---|
| PROTEIN g | 2.1 | RIBOFLAVIN (VITAMIN $B_2$) mcg | 140 | CALCIUM mg | 78 |
| FAT g | 5.3 | VITAMIN $B_6$ mcg | 60 | PHOSPHORUS mg | 43 |
| CARBOHYDRATE g | 11 | VITAMIN $B_{12}$ mcg | 0.3 | MAGNESIUM mg | 8 |
| WATER g | 134 | NIACIN mcg | 1000 | IRON mg | 1.8 |
| LINOLEIC ACID mg | 800 | FOLIC ACID (FOLACIN) mcg | 16 | ZINC mg | 1 |
| **VITAMINS:** | | PANTOTHENIC ACID mcg | 500 | MANGANESE mcg | 15 |
| VITAMIN A IU | 300 | BIOTIN mcg | 3 | COPPER mcg | 75 |
| VITAMIN D IU | 60 | VITAMIN C (ASCORBIC ACID) mg | 12 | IODINE mcg | 15 |
| VITAMIN E IU | 2 | CHOLINE mg | 24 | SELENIUM mcg | 2.8 |
| VITAMIN K mcg | 9 | INOSITOL mg | 6 | SODIUM mg | 27 |
| THIAMINE (VITAMIN $B_1$) mcg | 80 | | | POTASSIUM mg | 108 |
| | | | | CHLORIDE mg | 63 |

DISTRIBUTED BY CVS PHARMACY, INC ONE CVS DRIVE, WOONSOCKET, RI 02895

20. Caregivers are familiar with the unique format that nutrition information is presented on infant formula products, distinct from the Nutrition Facts on all other foods.

21. The use of the infant formula panel on a product not intended for infants is misleading

6

because it gives caregivers the impression that the Product, like infant formula, is subject to heightened and specific FDA regulations.

22.     In layman's terms, it makes the Product look more "serious" and quasi-clinical.

## III.   TODDLER BEGINNINGS IS NUTRITIONALLY INCONSISTENT WITH EXPERT ADVICE AND MORE EXPENSIVE THAN RECOMMENDED ALTERNATIVES

23.     Child nutrition experts universally oppose consumption of added sugars by children between twelve and twenty-four months.

24.     Contrary to the recommended nutritional needs of children in this age range, the Product contains added sugar, shown in the ingredients as "CORN SYRUP" and "LACTOSE."



**INGREDIENTS:** NONFAT MILK, VEGETABLE OILS (PALM OLEIN, SOY, COCONUT, HIGH OLEIC [SAFFLOWER OR SUNFLOWER] OILS), CORN SYRUP, LACTOSE, CALCIUM PHOSPHATE, **LESS THAN 1%:** MORTIERELLA ALPINA OIL (A SOURCE OF ARACHIDONIC ACID (ARA)), CRYPTHECODINIUM COHNII OIL (A SOURCE OF DOCOSAHEXAENOIC ACID (DHA)), FRUCTO-OLIGOSACCHARIDES (FOS), MIXED TOCOPHEROL CONCENTRATE, MONOGLYCERIDES, SOY LECITHIN, VITAMIN A PALMITATE, VITAMIN D (CHOLECALCIFEROL), VITAMIN E (DL-ALPHA TOCOPHERYL ACETATE), VITAMIN K (PHYTONADIONE), ASCORBYL PALMITATE, BETA-CAROTENE, THIAMINE HYDROCHLORIDE,

RIBOFLAVIN, PYRIDOXINE HYDROCHLORIDE, CYANOCOBALAMIN, NIACINAMIDE, FOLIC ACID, CALCIUM PANTOTHENATE, BIOTIN, ASCORBIC ACID, CHOLINE BITARTRATE, INOSITOL, CALCIUM CARBONATE, CALCIUM HYDROXIDE, CUPRIC SULFATE, FERROUS SULFATE, MANGANESE SULFATE, POTASSIUM BICARBONATE, POTASSIUM CHLORIDE, POTASSIUM PHOSPHATE, SODIUM CITRATE, SODIUM SELENITE, ZINC SULFATE, L-CARNITINE, TAURINE.

25.     The use of the infant formula panel as opposed to the legally required Nutrition Facts prevents caregivers from discovering the Product contains added sugars.

26.     Compared to whole cow's milk, recommended by global health authorities, the Product contains more calories, fat and sugar (carbohydrates), but less protein.

**Nutritional Composition for 8 fl. oz.**

| Nutrient | Unit | Whole Cow's Milk | Toddler Beginnings |
|----------|------|------------------|--------------------|
| Energy | cal | 149 | 160 |
| Protein | g | 7.69 | 4.16 |
| Total Fat | g | 7.98 | 8.48 |
| Carbohydrate | g | 12.8 | 16.80 |

27.     The Product costs no less than $20.79 for 20 oz (567 g).

28.     Based on the label, the Product yields 134 fl oz.

29.     According to the Retail Milk Prices Report of the United States Department of Agriculture, whole milk in major cities in this State costs $3.85 per gallon.

30.     When the per ounce cost of whole milk is compared to the Product, the price difference is apparent.

| Price | Cow's Milk (whole) | Toddler Beginnings |
|---|---|---|
| Price ($/8 fl oz) | 0.24 | 1.24 |
| Price ($/gallon) | 3.85 | 19.86 |

31.    Toddler Beginnings is over five times the cost of the recommended alternative and nutritionally superior choice of whole cow's milk.

## IV.    SIMILAR LABELING SHOWN TO MISLEAD CAREGIVERS

32.    Studies have shown that the similar labeling of infant and transition formulas causes caregivers to make inaccurate and ill-advised nutritional purchasing decisions.

33.    For instance, one study concluded that 52% of caregivers expected transition formulas, such as the Toddler Beginnings, to "give toddlers nutrition that they wouldn't get from other sources."[6]

34.    Seventy percent of caregivers mistakenly believe that products like Toddler Beginnings are nutritionally appropriate for children in the age range indicated on the label, despite expert opinions that they offer "no unique nutritional value beyond what could be achieved through a nutritionally adequate diet; furthermore, they contribute added sugars to diet."[7]

35.    Public health research has shown that use of products such as Toddler Beginnings results in prolonged use of expensive, re-branded, infant formula instead of transitioning infants to cow's milk, water and other healthy foods, which provide nutrients that milk cannot provide.

## V.    MISLEADING ABOUT GMOS

36.    In recent years, consumers have become significantly more aware of, and sensitive

---

[6] Maria J Romo-Palafox and JL Pomeranz et al., Marketing claims on infant formula and toddler milk packages: What do caregivers think they mean? , UCONN Rudd Center for Food Policy & Obesity, September 2019.
[7] Id.

9

to, products that have been approved by independent third-parties, and buy those products based upon that independent verification of an attribute or quality they value.

37.   Consumers have become significantly more aware of, and sensitive to, genetically modified organisms ("GMOs") in their food.

38.   This is especially important when providing nutrition to small children.

39.   Many consumers try to avoid GMOs for reasons including negative health and environmental impact.

40.   To meet consumer demand for non-GMO products, an industry of independent, third-party validation companies has developed.

41.   These independent organizations review a product's ingredients and assure consumers they do not contain GMOs nor come from animals who have consumed GMO feed.

42.   Obtaining this approval allows companies to obtain a competitive advantage and to sell more products at higher prices.

43.   Recognizing the value of independent certification, the Federal Trade Commission ("FTC") has warned companies to be careful in making representations about independent certification. See 16 C.F.R. § 260.1.

44.   The FTC guidelines against deceptive marketing regarding "Certifications and Seals of Approval" state that it is deceptive to misrepresent, directly or by implication, that a product, package, or service has been endorsed or certified by an independent third party. 16 C.F.R. § 260.6(a).

45.   In violation of the FTC's warnings, defendant represents the Product as verified by an independent third-party with respect to GMOs, through the front panel mark stating "Non-GMO¥ – ¥ Ingredients not genetically engineered."



46.    In developing their "non-GMO" mark, defendant mimicked the content and message of the foremost independent verification organization – the Non-GMO Project.



47.    The Non-GMO Project, headquartered in Bellingham, Washington, is a not-for-profit organization founded in 2007 that bases its work upon "rigorous scientific foundation and world-class technical support."

48.    Through the Non-GMO Project's work with the Global ID Group, these entities are "the world leaders in non-GMO testing, certification, and consulting."

49.    The Non-GMO Project's Product Verification Program is widely recognized with more than 3,000 verified brands, over 43,000 products and more than $19.2 billion in annual sales.

50.    The Non-GMO Product Verification Program verifies that products are not derived from GMO crops and that milk and meat are not derived from animals fed GMO crops.

51.    Unfortunately for consumers, Defendant's non-GMO representation is false and

misleading.

52. Defendant's non-GMO mark is not bestowed by a non-profit or neutral third-party, but by itself.

53. Looking to profit off consumer desire for independently validated products, Defendant created a deceptive non-GMO mark that mimics the Non-GMO Project seal.

54. The iconic orange butterfly of the Non-GMO Project is noticeably mimicked, as Defendant's mark uses the "Yen" symbol in place of an asterisk, which appears to copy the "Y" formed by the butterfly's wings.



55. Defendant could have chosen a hundred other symbols to use instead of the yen symbol but chose not to.

56. Defendant's mark tells the "half-truth" that while the Product may not be made directly with genetically modified or engineered ingredients, GMOs were used only one level back in the food production process.

57. For example, the Product contains dairy ingredients including nonfat milk and

lactose, that come from cows fed GMO grains.

58. Therefore, the ingredients in the Product are derived from GMOs even though the Product may not be made directly with GMO ingredients.

59. This violates the standard of the Non-GMO Project, which prohibits its seal on dairy-based products that could be from animals fed GMO feed.

60. Defendant avoids the Non-GMO Project's feed standard by using their own, self-created non-GMO mark, misleading consumers.

61. Defendant relies on consumer familiarity and trust of the seal of the Non-GMO Project and does not expect them to realize there is a difference.

## VI. CONCLUSION

62. The Product contains and makes other representations and omissions which are false or misleading.

63. While the Product describes itself as "milk-based powder" and contains dairy as the first ingredient, this is in the form of nonfat milk.

64. Young children require the nutrients not from nonfat milk, but from whole milk, which contains milkfat, essential to child development.

65. In place of milkfat, the Product substitutes lower quality vegetable fats in the form of palm and other oils.

66. Consumers expect the statement of "milk-based powder" to mean a product based on milkfat, instead of nonfat milk.

67. Defendant's representation of the Product as "milk-based powder" is misleading.

68. Reasonable consumers must and do rely on a company to honestly identify and describe the components, attributes, and features of a product, relative to itself and other

comparable products or alternatives.

69.     The value of the Product that Plaintiff purchased was materially less than its value

as represented by Defendant.

70.     Defendant sold more of the Product and at higher prices than it would have in the

absence of this misconduct, resulting in additional profits at the expense of consumers.

71.     Had Plaintiff and proposed class members known the truth, they would not have

bought the Product or would have paid less for it.

72.     As a result of the false and misleading representations, the Product is sold at a

premium price, approximately no less than no less than $20.79 for 20 OZ, excluding tax and sales,

higher than similar products, represented in a non-misleading way, and higher than it would be

sold for absent the misleading representations and omissions.

<u>Jurisdiction and Venue</u>

73.     Jurisdiction is proper pursuant to Class Action Fairness Act of 2005 ("CAFA"). 28

U.S.C. § 1332(d)(2).

74.     The aggregate amount in controversy exceeds $5 million, including any statutory

damages, exclusive of interest and costs.

75.     Plaintiff Stephanie Surratt is a citizen of Illinois.

76.     Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with a principal place

of business in Woonsocket, Providence County, Rhode Island

77.     Plaintiff and Defendant are citizens of different states.

78.     The Product is available to consumers from Defendant's retail stores and its website.

79.     Venue is in the Eastern Division in this District because a substantial part of the

events or omissions giving rise to these claims occurred in Kane County, i.e., Plaintiff's purchase,

14

consumption, and/or use of the Product and awareness and/or experiences of and with the issues described here, consumption referring to that of the child whose care with which she was entrusted.

Parties

80.  Plaintiff Stephanie Surratt is a citizen of Aurora, Kane County, Illinois.

81.  Defendant CVS Pharmacy, Inc. is a Rhode Island corporation with a principal place of business in Woonsocket, Rhode Island, Providence County.

82.  Founded as Consumer Value Stores over fifty years ago in Massachusetts, CVS has consistently been a place for consumers to fill their most important needs.

83.  Originally selling a variety of goods, CVS became focused on meeting the healthcare needs of Americans and is a leading pharmacy and healthcare company.

84.  From the almost ten thousand CVS stores in all 50 states, consumers have confidence CVS is looking out for their health.

85.  Consumers consistently rank CVS as giving them the most value for their money, in addition to relying on the advice of their trained staff and pharmacists.

86.  According to surveys, the CVS brand enjoys a high level of trust from the public, more than other national pharmacies.

87.  CVS is known for its honest values and unique approach to its business and the communities it operates in, through a rigorous code of conduct, and high levels of transparency.

88.  While CVS stores sell leading national brands, they sell a large number of products under one of their private label brands, CVS Health.

89.  Private label products are made by third-party manufacturers and sold under the name of the retailer, or its sub-brands.

90.  Previously referred to as "generic" or "store brand," private label products have

increased in quality, and often are superior to their national brand counterparts.

91. Products under the CVS Health brand have an industry-wide reputation for quality and value.

92. In releasing products under the CVS Health brand, Defendant's foremost criteria was to have high-quality products that were equal to or better than the national brands.

93. Defendant is able to get national brands to produce its private label items due its loyal customer base and tough negotiating.

94. That CVS Health branded products met this high bar was proven by focus groups, which rated them above the name brand equivalent.

95. Private label products generate higher profits for retailers because national brands spend significantly more on marketing, contributing to their higher prices.

96. A survey by The Nielsen Co. "found nearly three out of four American consumers believe store brands are good alternatives to national brands, and more than 60 percent consider them to be just as good."

97. Private label products under the CVS Health brand benefit by their association with consumers' appreciation for the CVS brand as a whole.

98. The development of private label items is a growth area for CVS, as they select only top suppliers to develop and produce CVS Health products.

99. The Product is available to consumers from Defendant's retail stores and its website.

100. Plaintiff purchased the Product on one or more occasions within the statutes of limitations for each cause of action alleged, at CVS, at locations including 300 N Eola Rd Aurora IL 60502-9062 between January 2020 and January 2021, among other times.

101. Plaintiff believed the Product was nutritionally-appropriate for a child in the

identified age range, instead of a product that is not recommended by all relevant expert bodies.

102.   Plaintiff bought the Product because she expected it was nutritionally-appropriate for a child in the identified age range, instead of a product that is not recommended by all relevant expert bodies because that is what the representations said and implied.

103.   Plaintiff had a legal duty as a caregiver of a child in the age range identified on the label and relied on Defendant's representations that the Product was nutritionally appropriate for such a child.

104.   Plaintiff believed the Product was the next step for the child for whose care she was obligated, based on the labeling, and physical placement next to the infant formula product sold by Defendant.

105.   Plaintiff relied on the words, layout, packaging, and/or images on the Product, on the labeling, statements, omissions, and/or claims made by Defendant in digital, print and/or social media, which accompanied the Product and separately, through in-store, digital, audio, and print marketing.

106.   Plaintiff was aware that Defendant's infant formula was marketed similarly to the Product, which affected Plaintiff's decision to purchase it.

107.   Plaintiff was disappointed because she believed the Product was nutritionally-appropriate for a child in the identified age range, instead of a product that is not recommended by all relevant expert bodies.

108.   Plaintiff bought the Product at or exceeding the above-referenced price.

109.   Plaintiff would not have purchased the Product if she knew the representations and omissions were false and misleading or would have paid less for it.

110.   Plaintiff chose between Defendant's Product and products represented similarly, but

which did not misrepresent their attributes, features, and/or components.

111.  The Product was worth less than what Plaintiff paid and she would not have paid as much absent Defendant's false and misleading statements and omissions.

112.  Plaintiff intends to, seeks to, and will purchase the Product again when she can do so with the assurance the Product's representations are consistent with its abilities, attributes, and/or composition.

113.  Plaintiff is unable to rely on the labeling and representations not only of this Product, but for other similar nutritionally-appropriate foods and beverages for children entrusted to her care, because she is unsure whether those representations are truthful.

<u>Class Allegations</u>

114.  Plaintiff seeks certification under Fed. R. Civ. P. 23 of the following classes:

> **Illinois Class:** All persons in the State of Illinois who purchased the Product during the statutes of limitations for each cause of action alleged; and

> **Consumer Fraud Multi-State Class**: All persons in the States of Iowa, Louisiana, West Virginia, Michigan, Texas, Arkansas, Virginia and Oklahoma, who purchased the Product during the statutes of limitations for each cause of action alleged.

115.  Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiff and class members are entitled to damages.

116.  Plaintiff's claims and basis for relief are typical to other members because all were subjected to the same unfair and deceptive representations and actions.

117.  Plaintiff is an adequate representative because her interests do not conflict with other members.

118.  No individual inquiry is necessary since the focus is only on Defendant's practices

and the class is definable and ascertainable.

119.   Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

120.   Plaintiff's counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

121.   Plaintiff seeks class-wide injunctive relief because the practices continue.

<u>Illinois Consumer Fraud and Deceptive Business Practices Act</u>
<u>("ICFA"), 815 ILCS 505/1, et seq.</u>

<u>(Consumer Protection Statute)</u>

122.   Plaintiff incorporates by reference all preceding paragraphs.

123.   Plaintiff and class members desired to purchase a product that was nutritionally-appropriate for a child in the identified age range, instead of a product that is not recommended by all relevant expert bodies.

124.   Defendant's false and deceptive representations and omissions are material in that they are likely to influence consumer purchasing decisions.

125.   Defendant misrepresented the Product through statements, omissions, ambiguities, half-truths and/or actions.

126.   Plaintiff relied on the representations that the Product was nutritionally-appropriate for a child in the identified age range, instead of a product that is not recommended by all relevant expert bodies.

127.    Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

<u>Violation of State Consumer Fraud Acts</u>

<u>(On Behalf of the Consumer Fraud Multi-State Class)</u>

128.  The Consumer Fraud Acts of the States in the Consumer Fraud Multi-State Class are similar to the above-referenced consumer protection statute and prohibit the use of unfair or deceptive business practices in the conduct of trade or commerce.

129.  Defendant intended that each of members of the Consumer Fraud Multi-State Class would rely upon its deceptive conduct, and a reasonable person would in fact be misled by this deceptive conduct.

130.  As a result of Defendant's use or employment of artifice, unfair or deceptive acts or business practices, each of the other members of the Consumer Fraud Multi-State Class have sustained damages in an amount to be proven at trial.

131.  In addition, Defendant's conduct showed motive, and the reckless disregard of the truth such that an award of punitive damages is appropriate.

<u>Breach of Contract</u>

132.  Plaintiff entered into a contract with Defendant for purchase of the Product.

133.  The terms of the contract provided that the Product was nutritionally-appropriate for a child in the identified age range, instead of a product that is not recommended by all relevant expert bodies.

134.  Defendant breached the contract because the Product did not meet the terms Plaintiff agreed to.

135.  Plaintiff was damaged by the breach, and those damages include the purchase price.

Breaches of Express Warranty,
Implied Warranty of Merchantability/Fitness for a Particular Purpose and
Magnuson Moss Warranty Act, 15 U.S.C. §§ 2301, *et seq*.

136.  The Product was manufactured, identified, and sold by Defendant and expressly and impliedly warranted to Plaintiff and class members that it was nutritionally-appropriate for a child in the identified age range, instead of a product that is not recommended by all relevant expert bodies.

137.  Defendant directly marketed the Product to Plaintiff and consumers through its advertisements and marketing, through various forms of media, on the packaging, in print circulars, direct mail, and targeted digital advertising.

138.  Defendant knew the product attributes that potential customers like Plaintiff were seeking and developed its marketing and labeling to directly meet those needs and desires.

139.  Defendant's representations about the Product were conveyed in writing and promised it would be defect-free, and Plaintiff understood this meant the Product was nutritionally-appropriate for a child in the identified age range, instead of a product that is not recommended by all relevant expert bodies.

140.  Defendant's representations affirmed and promised that the Product was nutritionally-appropriate for a child in the identified age range, instead of a product that is not recommended by all relevant expert bodies.

141.  Defendant described the Product as one which was nutritionally-appropriate for a child in the identified age range, instead of a product that is not recommended by all relevant expert bodies, which became part of the basis of the bargain that the Product would conform to its affirmations and promises.

142.  Defendant had a duty to disclose and/or provide non-deceptive descriptions and marketing of the Product.

143. This duty is based on Defendant's outsized role in the market for this type of Product, the largest healthcare company in the nation, known for its expertise, established history of putting customers first, and delivering value and market leader.

144. Plaintiff recently became aware of Defendant's breach of the Product's warranties.

145. Plaintiff provided or will provide notice to Defendant, its agents, representatives, retailers, and their employees.

146. Plaintiff hereby provides notice to Defendant that it has breached the express and implied warranties associated with the Product.

147. Defendant received notice and should have been aware of these issues due to complaints by third-parties, including regulators, competitors, and consumers, to its main offices, and by consumers through online forums.

148. The Product did not conform to its affirmations of fact and promises due to Defendant's actions.

149. The Product was not merchantable because it was not fit to pass in the trade as advertised, not fit for the ordinary purpose for which it was intended and did not conform to the promises or affirmations of fact made on the packaging, container or label.

150. The Product was not merchantable because Defendant had reason to know the particular purpose for which the Product was bought by Plaintiff, because she expected it was nutritionally-appropriate for a child in the identified age range, instead of a product that is not recommended by all relevant expert bodies, and she relied on Defendant's skill and judgment to select or furnish such a suitable product.

151. Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Negligent Misrepresentation

152.  Defendant had a duty to truthfully represent the Product, which it breached.

153.  This duty was non-delegable, and based on Defendant's position, holding itself out as having special knowledge and experience in this area, the largest healthcare company in the nation, known for its expertise, established history of putting customers first, and delivering value.

154.  Defendant's representations regarding the Product went beyond the specific representations on the packaging, as they incorporated its extra-labeling promises and commitments to quality, transparency and putting customers first.

155.  These promises were outside of the standard representations that other companies may make in a standard arms-length, retail context.

156.  The representations took advantage of consumers' cognitive shortcuts made at the point-of-sale and their trust in Defendant.

157.  Plaintiff and class members reasonably and justifiably relied on these negligent misrepresentations and omissions, which served to induce and did induce, their purchase of the Product.

158.  Plaintiff and class members would not have purchased the Product or paid as much if the true facts had been known, suffering damages.

Fraud

159.  Defendant misrepresented and/or omitted the attributes and qualities of the Product, that it was nutritionally-appropriate for a child in the identified age range, instead of a product that is not recommended by all relevant expert bodies.

160.  Moreover, the records Defendant is required to maintain, and/or the information inconspicuously disclosed to consumers, provided it with actual and constructive knowledge of

the falsity, through statement and omission, of the representations.

161.  Defendant knew of the issues described here yet did not address them.

162.  Defendant's fraudulent intent is evinced by its knowledge that the Product was not consistent with its representations.

<u>Unjust Enrichment</u>

163.  Defendant obtained benefits and monies because the Product was not as represented and expected, to the detriment and impoverishment of Plaintiff and class members, who seek restitution and disgorgement of inequitably obtained profits.

<u>Jury Demand and Prayer for Relief</u>

Plaintiff demands a jury trial on all issues.

**WHEREFORE**, Plaintiff prays for judgment:

1.  Declaring this a proper class action, certifying Plaintiff as representative and the undersigned as counsel for the class;

2.  Entering preliminary and permanent injunctive relief by directing Defendant to correct the challenged practices to comply with the law;

3.  Injunctive relief to remove, correct and/or refrain from the challenged practices and representations, and restitution and disgorgement for members of the class pursuant to the applicable laws;

4.  Awarding monetary damages, statutory and/or punitive damages pursuant to any statutory claims and interest pursuant to the common law and other statutory claims;

5.  Awarding costs and expenses, including reasonable fees for Plaintiff's attorneys and experts; and

6.  Other and further relief as the Court deems just and proper.

Dated:   February 5, 2022

Respectfully submitted,

Sheehan & Associates, P.C.
/s/Spencer Sheehan
60 Cuttermill Rd Ste 409
Great Neck NY 11021
Tel: (516) 268-7080
spencer@spencersheehan.com